*800 OPINION.
James:
The questions presented in these appeals are as follows: (1) The basis of cost upon which to compute the profit to W. M. Leary derived either, as he claims, through the sale of property in 1919, or, as the Commissioner claims, through the dissolution of the Forest Park Realty Co.; (2) the same basis as to Robert Jemison, Jr.; (3) whether or not the Forest Park Realty Co. realized a gain from the sale of the property which it owned prior to its dissolution in 1919, and, if a gain was realized, the measure of that gain; and (4) whether the alleged gifts of stock by Robert Jemison, Jr., and W. M. Leary to their respective wives just prior to the dissolution of the Forest Park Realty Co. operated to reduce the profits realized by each of them, either from the sale of property or from the dissolution of the corporation.
Taking up these points in order, it is the claim of W. M. Leary that the property received by him from the Avondale Land Co. and turned in to the Forest Park Realty Co. was of the reasonable value of $2,000 or more per acre, and that on the dissolution of that company he could not have realized a profit, since his total investment on the basis of the alleged value paid in was approximately $350,000, whereas he and his wife received from the Birmingham Realty Co. $21,501.31 each and notes in the amount of $50,000 each. The record does not disclose what bonds of the company theretofore issued were liquidated to him prior to the above-mentioned transaction, or whether he received the entire amount of $155,000 par value theretofore issued to him. If his claim is correct as to value of land turned in and is otherwise unassailable as a matter of law, this is immaterial, since it is apparent that, even if the gift to his wife is held to be invalid, the total amount received is less than the value of the property turned in for bonds and stock to the Forest Park Realty Co.
Reviewing, therefore, the circumstances under which Leary acquired the bonds and stock above mentioned, it appears that for many years prior to the fall of 1917 Leary’s father was the owner of a majority of the stock of the Avondale Land Co., and managed the affairs of that company to the dissatisfaction of all the other stockholders. The property of the company was valuable and was so situated as to make possible its profitable development as residential property in Birmingham. That development was not likely under the conditions surrounding the management of the Avondale *801 Land Co. Under these circumstances Jemison conceived the idea of eliminating the majority stockholder, J. F. Leary, and the minority stockholders in such a manner as to secure to them the return of at least the value then realizable, while at 'the same time making it possible for him and W. M. Leary to develop the property and make a profit for themselves. Jemison negotiated with the minority stockholders; W. M. Leary dealt with his father. They persuaded the stockholders to part with their stock in exchange for bonds of a company to be organized, secured in each case by specific mortgage upon specific property to be deeded to the new corporation by each of the interests involved as an equitable division between them. In consideration of bringing about this arrangement Jemison and Leary received a substantial amount of land, some 40 acres, as a reward for their services, and they turned that in to the new company for its stock, thereby assuring either, in case of dissolution by foreclosure, an automatic separation of the majority and minority interests in the old company, or, in the event of profitable operation, the centering of all the profits in themselves. By this arrangement majority and minority stockholders consented to step out of the company and to take, as nearly as could be, a liquidation of their respective interests on the basis of $200 per share in the Avondale Land Co. These parties were capable business men of Nashville and Birmingham, obviously looking out for their own interests, and unquestionably endeavoring to secure from their property all that they thought was possible. Considerable evidence was introduced by the taxpayer as to the values of property in Birmingham in 1911, in order to place a value of $2,000 or more per acre upon the property of the Avondale Land Co. But we can not ignore the fact that the property consisted of a large tract of undeveloped real estate, requiring much intensive work to market, and marketable only over a considerable period of time. Nor •can we ignore the fact that this was a wholesale transaction, and that it clearly appears in the evidence not only that the parties were .assured by Jemison at the time that their stock was worth not more than $125 per share, but also that real estate was much more active in the years 1918, 1919, and 1920 in this portion of Birmingham than it had ever been before. Upon all the evidence, we feel justified in finding no greater value turned in to the Forest Park Realty •Co. than the value placed upon it by the parties at the time, except as to the property turned in by Jemison and Leary for stock, upon which we find a value of $1,000 per acre, corresponding to the value : attached to the property turned in for bonds.
Leary further contends that his cost is to be computed, for the •purpose of measuring the profit derived from the sale to the Bir *802 mingham Realty Co., not only by the property turned in for stock but also by the property turned in for bonds. But this is covered by the findings as to value set forth above. It is important, however, to point out that Leary turned in specific property for his bonds, and in an entirely distinct and separate transaction turned in certain other specific property for stock. Each was a separate-transaction, and the profit or loss on the subsequent disposition of the bonds or stock is to be measured by the proceeds of each independently of the other. Indeed, if the Board were called upon to determine the gain or loss derived from the entire transaction under Leary’s theory and found a value of the land in excess of $1,000 per acre, it would be impossible to do other than affirm the Commissioner, since there is no evidence in the record as to Leary’s realization on the bonds, or whether he was still the owner of them at the time of the dissolution of the Forest Park Realty Co.
We conclude, therefore, that the basis as to Leary upon which profit is to be computed upon the sale of property on the dissolution of Forest Park Realty Co. is $20,500, divided into two parts amounting to $10,250 each.
As to Jemison, it is apparent from the foregoing that he, like Leary, was in receipt of $20,000 of income in the form of real estate paid for services in 1917, and this $20,000, plus $500 paid in in cash, forms the basis from which to compute the profit on the transaction, occurring in 1919, divisible also into two equal parts.
We now come to consider whether the Forest Park Realty Co. realized a gain from the transaction occurring in 1919. The facts are, briefly, that Jemison negotiated the sale to the Birmingham Realty Co. of the major portion of the property of the Forest Park Realty Co. for a consideration of $485,000. As a basis of computing profit on this sale the Commissioner has used $210,000. or, in other words, $1,000 per acre, which for all practical purposes is a satisfactory basis under the circumstances, and has alleged a profit of $275,000 derived from the sale, subject, of course, to deductions for costs of carrying out the operation, as to which values- and costs there now appears to be no substantial dispute.
It appears that when Jemison had concluded his negotiations-with Beatty upon all the substantial points involved in the transaction it became clear to both Jemison and Leary, but more particularly to Leary, that the tax would be very substantial if the transaction were carried through by the corporation, that there-would be little or no further use for the Forest Park Realty Co., and that more taxes would attach to the individuals on the liquidation of that company whenever that might take place. Under these-circumstances Leary consulted an Atlanta attorney, a friend of *803 his, who apparently advised him as to the methods to be pursued to avoid the tax, these methods consisting (1) in giving his wife a portion of his stock in the Forest Park Realty Co., and (2) in dissolving that corporation and distributing its assets in kind prior to the consummation of the sale. Both these steps were taken. Leary gave his wife half his stock; Jemison did likewise, and the Forest Park Realty Co. was dissolved almost simultaneously with the ultimate carrying out of the sale.
The facts are that on September 19, 1919, the directors of the Forest Park Realty Co. determined upon a dissolution, and upon the 20th the stockholders ratified that determination and filed a certificate of dissolution. On September 22 the trustees in dissolution, Jemison, Leary, and their wives caused deeds to be drawn, bearing that date, from themselves as trustees in dissolution to themselves as stockholders, first of the property included in the Birmingham sale and second of the balance of the property then owned by the Forest Park Realty Co. Under date of September 22 a deed was also drawn running to the Birmingham Realty Co., also acknowledged by Virginia W. Jemison in New York and by the other parties in Birmingham. This deed was delivered on the 24th, and on that day the individuals holding the land, Leary and his wife separately, and Jemison for himself and his wife, received the amounts set forth in our findings of fact. The Forest Park Realty Co. at that time was nonexistent, except for the purpose of winding up its affairs, and it had at that time disposed of its assets. This was not only the form but the substance of the transaction. To say that the Forest Park Realty Co. derived a gain from the transaction above set forth is to say that it cap be compelled to remain in existence for the purpose of registering a profit on the sale of its property and paying taxes thereon. But no taxpayer, individual or corporate, can be compelled to make profits. Taxes attach to profits which are actually made, and not to profits which might be made. The dissolution of the Forest Park Realty Co. was not a subterfuge; it was a fact, and after its dissolution the corporation, by the very nature of things, could not make profits out of property to which it had theretofore parted with title and possession. The Commissioner contends that its dissolution really effected a distribution of the proceeds of the sale of its property rather than of its property. The fact is otherwise. The corporation had disposed of its property and dissolved. It did not sell its property, receive and distribute the proceeds, and dissolve. The fact that by the procedure taken the corporation avoided a tax is not sufficient reason, in the absence of proof of fraud, to hold the *804 transaction other than what it actually was. In this connection it is interesting to note that the Commissioner, after first asserting fraud penalties upon the individuals, withdrew those penalties, but never asserted a fraud penalty, so far as our record shows, against the corporation. These transactions were either fraudulent or they were what the taxpayers claim them to have been. The parties either accomplished what they set out to accomplish, namely, the registering of the profit in the names and on the part of the individuals, or they failed to do so. If they succeeded they owe a tax upon the transaction as individuals, and if they knowingly and willfully failed to report that profit as taxable gain they were guilty of fraud. If the corporation made the profit and its officers willfully and knowingly failed to return that profit they and the corporation were guilty of fraud. If the tax was successfully avoided there was neither a fraud nor a tax. The two are inseparable. If the device succeeded it avoided the tax; if it failed the transaction was fraudulent; and there is no concealment on the part of the parties that they intended to do exactly what they did. If what they did was unlawful they were guilty of fraud, whether or not they specifically intended to violate the law. Horning v. District of Columbia, 254 U. S. 135.
Whether the corporation was in receipt of taxable income after eliminating the above item of $275,000 is somewhat doubtful, since there must also be eliminated under the rule as herein laid down some deductions which the Commissioner allowed in connection with measuring the profit to the corporation, particularly the cost of making the sale, and some taxes and other obligations which were assumed by the sellers in connection with the transfer to the Birmingham Realty Co. Inasmuch as these deductions allowed by the Commissioner are properly allowable to the individuals who made the sale to the Birmingham Realty Co., they form no part of the corporate deductions for the year, and the correct computation of the tax of the corporation is left to be settled under Rule 50 by proper adjustment between the Commissioner and the taxpayer.
Next to be considered is the basis for the computation of gain or loss to Jemison and Leary, and for that purpose we will first consider the basis to be adopted in the event that all of the profit is to be imputed to them. They received from the dissolution of the Forest Park Realty Co. real property a portion of which was thereafter sold to the Birmingham Realty Co. and a portion of which they retained. There is nothing in the record to show exactly the basis of value of this retained property. It appears to have been omitted by the Commissioner in all of his computations.
From the deed transferring this property, set forth in full in our findings, we find the following facts: (1) That the Forest Park *805 Realty Co., to secure the release of the tracts transferred to Jemison, Leary, and their wives, paid $11,000 from the proceeds of sale allocated to the retirement of bonds for the purpose of securing that release, and that that $11,000 was by the agreement with the trust company substantially 50 per cent of the value of the property so released. On that basis the property delivered to the four individuals in liquidation was of the value of approximately $22,000, or $5,500 each. By the agreement between the parties and the Birmingham Realty Co. it further appears that 20 per cent of certain amounts set forth in that agreement, aggregating as to such 20 per cent $9,546, was to be retained from the selling prices of the lots there set forth by the vendor parties, and also that $9,485.28 was required to be paid to the vendors on account of expenditures theretofore made by the Forest Park Realty Co., making a total of $19,031.28 apparently received by them in excess of the amounts paid directly to them by the Birmingham Realty Co. Offsetting this total of $19,031.28 there was paid approximately $1,800 to acquire a lot required by the Birmingham Realty Co. to enable it to replat the property and provided for in article 8 of the contract above referred to. This represents a total net amount of $17,231.28 received by the four individuals in connection with the transfer and not shown on the record to have been in the actual consideration paid for the property sold. It is of record that Jemison and Leary and their wives received $71,501.31 each, or $143,002.62, in respect to each interest in actual cash from the Birmingham Realty Co., plus real property of a value of $22,000, divided into four parts. It appears, therefore, that the four individuals received between them $286,-005.24, plus $17,231.28, plus $22,000, or a total of $325,236.52, out of which they may have deducted some “ out-of-pocket ” disbursements for attorneys, etc., in connection with the sale, which the Commissioner, by treating the transaction as one made by' the Forest Park Realty Co., has allowed as deductions to that company. Upon the record we find that the net amount received by the individuals for the purpose of measuring the gain derived from the transaction was, as to all four individuals, not less than $308,005.24, and not more than $325,236.52-, the latter figure to be adjusted as to any amounts heretofore allowed by the Commissioner in connection with the determination of the income of the Forest Park Realty Co. and transferred to the individuals under this decision. In the event, also, that any portion of the above amount of $17,231.28 was in fact not received by the individuals, adjustment therefor should be made in the decision under Rule 50 herein. In the absence of such adjustment the total basis for the computation of gain shall be $325,236.52, minus $41,000, divided as hereinafter set forth.
*806 The next and last question is whether the above amounts received by the Jemison and Leary interests are divisible into four parts or into two; that is, whether there shall be attributed to Jemison and to Leary each one-half of the amount above set forth, or whether there shall be attributed to each of them only one-fourth thereof. In other words, the question is whether the gifts of 62¾ shares of stock by each of the parties to their respective wives on August 26 were valid and operated to defeat a taxable profit as to one-half of the amounts above set forth.
The Commissioner appears not to have questioned the fact of the gift or that the wives have since retained the proceeds of the sale above outlined. He says, however, that the gift was in substance a gift of the proceeds of the sale, and not a gift of the stock. This contention overlooks two facts; first, that at the time of the gift there had been no sale, and second, that the thing given was stock and the thing sold was real estate. The wives received the stock on August 26. On September 22 they exchanged that stock for real estate, and on that day they sold the greater part of the real estate. Certainly, if title to the stock passed on August 26, there can be no question that it was the wives who received and sold a portion of the interest in the real property. Here again the transaction was either fraudulent or it was real. If it was a fiction and a subterfuge, and if the wives were not the recipients of the gifts alleged, the returns of Jemison and Leary were false and fraudulent, and the penalty as well as the tax should be imposed upon them. If the gifts were real and valid, and were made at the time and in the manner the parties claim they were, then the stock from that time on was the property of the wives, and the subsequent transactions were the transactions of the wives and not of the husbands.
We may well look with suspicion upon transactions of this kind, and hold, as we have held, that where the circumstances at the time and subsequent transactions indicate that the gift or sale between husband and wife was a mere subterfuge to avoid a tax, the transaction is invalid. Appeal of P. B. Fouke, 2 B. T. A. 219. But we can not disregard the separate legal existence of husband and wife as individuals, or their separate rights to hold property and to make separate income-tax returns under both the general law and the Revenue Acts. So long as avoidance is permitted in tins' matter we can not hold that the mere resort to it is a fraud, nor can we reverse the chronology of the transaction itself and hold, as the Commissioner contends, that a gift of stock is a gift of the proceeds of the sale of real estate owned by the company, the stock in which was the subject matter of the gift.
*807 Inasmuch as the value of the stock of the Forest Park Fealty Co. on August 26 was reflected substantially by the existing offer to purchase its property for $485,000, and upon the dissolution of the corporation its assets were distributed in kind, we are unable to find as a fact that the 62½ shares given to the wives on that date had a value substantially different from one-fourth of the $325,-236.52 above set forth. Plence we are unable to find as to those shares that any taxable profit exists.
It follows from the above that Jemison and Leary each realized a gain in 1919 from the foregoing transactions of the difference between one-fourth of $325,236.52, the cash and other valuable assets received by them as a result of the dissolution of the Forest Park Fealty Co. and the sale of its property, and one-fourth of $41,000, the value of the property turned in to that company for stock. Their tax, therefore, should be computed upon this basis, including in the net income of each at least one-fourth of $808,005.24 and not exceeding $325,236.52, as above set forth. In the absence of agreement between the parties the tax will be computed on a gain of $71,059.13 each, as to Jemison and Leary.